IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

In re:

| | |
|---|---|
| HENG CHEONG PACIFIC LIMITED, | Case No. 3:19-bk-04895-BKT15 |
| WORLD-WIDE INVESTMENT SERVICES, LIMITED, | Case No. 3:19-bk-04897-BKT15 |
| NEW CENTURY PROPERTIES LIMITED | Case No. 3:19-bk-04898-BKT15 |
| | Chapter 15 |
| Debtors. | Jointly Administered Under Case No. 3:19-bk-04895-BKT15 |

_____

**MOTION FOR RELIEF PER RULE 60(b) RE: DOCKET ENTRIES 43 AND 75**

---

NOTICE OF OPPORTUNITY TO OBJECT

Pursuant to Local Rule 9013-1(c), within fourteen (14) days after service as evidenced by the certification, and an additional three (3) days pursuant to Fed. R. Bank. P. 9006(f) if you were served by mail, any party against whom this paper has been served, or any other party to the action who objects to the relief sought herein, shall serve and file an objection or other appropriate response to this paper with the clerk's office of the United States Bankruptcy Court for the District of Puerto Rico. If no objection or other response is filed within the time allowed herein, the paper will be deemed unopposed and may be granted unless: (i) the requested relief is forbidden by law; (ii) the requested relief is against public policy; or (iii) in the opinion of the court, the interest of justice requires otherwise.

---

This bankruptcy proceeding has been orchestrated to collaterally attack judgments the United States obtained in Utah and Oregon district court. As detailed below, the debtors, the petitioning creditors, and the foreign representatives have all been captured by John Wadsworth – who has effectively stationed himself on both the debtor and creditor sides of this bankruptcy. After twice losing to the United States, Wadsworth (through the guise of the creditors) initiated this proceeding in a blatant attempt to forum shop and improperly sweep assets into the

1

bankruptcy estate, all without providing the United States with proper notice. As a result, the court has been misled on numerous underlying facts, including the litigation history surrounding the two properties alleged to be part of the estate. The complete facts are outlined here.

## BACKGROUND

For at least 15 years, the United States has been engaged in efforts to collect the tax liabilities of longtime tax cheats Ronald and Annette Talmage, which has generated at least four other federal cases and a judgment for over $20 million in unpaid taxes. The four cases are:

(1) *Talmage v. Commissioner*, No. 13002-05 (U.S. Tax Ct.) ("Talmage Tax Court Case");
(2) *United States v. RiverCliff Farm, Inc.*, No. 3:16-cv-01248-SI (D. Or.) ("Oregon Foreclosure Suit"), which concerns the Corbett, Oregon property alleged to be part of the estate (the "RiverCliff Property");
(3) *Wadsworth v. Talmage*, No. 3:16-cv-02082-SI (D. Or.) ("Oregon Quiet Title Suit"), which also concerns the RiverCliff Property; and
(4) *United States v. Talmage*, No. 1:16-cv-00019-DN-PMW (D. Utah) ("Utah Foreclosure Suit"), which concerns the Liberty, Utah property alleged to be part of the estate (the "Liberty Property").

As established in prior litigation, Ronald Talmage created and controlled the three debtor entities in this case, Heng Cheong Pacific Limited ("HCPL"), New Century Properties Limited ("NCPL"), and World-Wide Investment Services Limited ("WWIS") (collectively, the "Debtors"). Utah Foreclosure Suit, Findings of Fact and Conclusions of Law issued Sept. 19, 2019 (Dkt. No. 324) ("Utah Findings") at 7; Talmage Tax Court Case, T.C. Memo. 2008-34, 2008 WL 440831, at *28-29 (Feb. 19, 2008). A review of prior litigation contextualizes this bankruptcy and shows how it is an attempt to undermine adverse judgments against the Debtors and/or Wadsworth (or their respective privies).

Talmage Tax Court Case.[1]

Ronald and Annette Talmage filed a Tax Court petition in 2005 challenging their federal income tax liabilities. In a 2008 opinion issued after trial, the Tax Court found the Talmages

---

[1] Although this case does not directly implicate any of the Debtors or the two properties that are alleged to belong to the estate, the fact findings are informative as to Talmage's control of NCPL and his longstanding ownership of the RiverCliff Property.

2

liable for millions in unpaid taxes. T.C. Memo. 2008-34, 2008 WL 440831 (Feb. 19, 2008), *aff'd*, 391 F. App'x 660 (9th Cir. 2010), *cert. denied*, 562 U.S. 1139 (2011). Among the Tax Court's findings were the following: (1) Ronald Talmage had large amounts of unreported income stemming from funds he wire transferred from NCPL to purchase and improve the RiverCliff Property (his personal home), and to satisfy his family support obligations. *Id.*, at *24-29. (2) Although NCPL is registered in the British Virgin Islands (BVI), its offices are in Hong Kong. *Id.*, at *2 n.3. (3) Ronald Talmage "misrepresented his ownership in the Rivercliff property for the purpose of evading income tax" and acted with an "intent to conceal income and assets to mislead [the IRS] for the purpose of evading tax." *Id.*, at *35-36. Following the 2008 Tax Court opinion, the Talmages tried to challenge other tax liabilities, but ultimately agreed to a stipulated decision on additional tax deficiencies. *Talmage v. Commissioner*, No. 31211-08 (U.S. Tax Ct.), Order entered Apr. 16, 2012.

Oregon Foreclosure Suit.

The United States filed suit in 2016 to foreclose federal tax liens against the RiverCliff Property. Oregon Foreclosure Suit, Complaint filed June 24, 2016 (Dkt. No. 1). Two Talmage entities, Debtor NCPL and its wholly owned subsidiary RiverCliff Farm, Inc., were named as parties to the suit. *Id.* The United States obtained a temporary restraining order against John Wadsworth and two of his associates after they tried to take possession of the RiverCliff Property by extrajudicial means, including impersonating a federal agent and threatening the property's caretaker. *Id.*, July 6, 2016 Motion for TRO (Dkt. No. 6); Order Granting TRO, 2016 WL 3658686 (D. Or. July 8, 2016) (Dkt. No. 11). John Wadsworth and "Does 1 Through 15" (*i.e.*, individuals allegedly defrauded by Talmage)[2] then attempted to intervene in the action to assert their purported interest in the RiverCliff Property, but the court denied both their motion to intervene and their motion to reconsider. 2016 WL 4582048, at *2-3 (D. Or. Sept. 2, 2016)

---

[2] Since the proposed intervenors sought to proceed anonymously, it is unknown if "Does 1 Through 15" include any of the petitioning creditors in this case. Upon information and belief, at least one of the petitioning creditors was included within "Does 1 Through 15."

3

(denying motion to intervene); 2016 WL 6662696, at *3 (D. Or. Nov. 10, 2016) (denying motion to reconsider). The court appointed a receiver to sell the RiverCliff Property in November 2016, and the receiver is required to deposit any proceeds into the court's registry. Oregon Foreclosure Suit, Order Appointing Receiver (Dkt. No. 51).

In August 2017, the Oregon district court entered judgment that the United States was entitled to foreclose federal tax liens against the RiverCliff Property to satisfy the Talmages' tax debts. *Id.*, Aug. 15, 2017 Judgment (Dkt. No. 57); Aug. 7, 2017 Opinion and Order Granting U.S. Motion for Default Judgment (Dkt. No. 55). The judgment specifically states that the RiverCliff Property is property "belonging to Ronald B. Talmage and Annette C. Talmage," that "**New Century Properties Limited has no interest in the River Cliff Property or any proceeds of its sale**," and that "any purported interest that [NCPL] claims to hold in the River Cliff Property is fraudulent and invalid." *Id.*, Aug. 15, 2017 Judgment (Dkt. No. 57 at ¶¶ D, F) (emphasis added). No appeal was filed.

To date, the RiverCliff Property has not been sold, despite having been listed for sale since about March 2018. The receiver has indicated that unique customizations on the property have made it more difficult to sell. Wadsworth and the supposed investors he represents have been aware of efforts to sell the RiverCliff Property for the past two years.

Oregon Quiet Title Suit.

After failing to intervene in the Oregon Foreclosure Suit, Wadsworth, both individually and as trustee of the RBT Victim Recovery Trust,[3] filed a quiet title suit to assert claims to the RiverCliff Property arising from Talmage's alleged fraud. Oregon Quiet Title Suit, Complaint filed Oct. 28, 2016 (Dkt. No. 1); Second Amended Complaint filed Apr. 25, 2017 (Dkt. No. 39). Wadsworth raised the same claims that the foreign representatives raise here, namely, that

---

[3] The RBT Victim Recovery Trust is a purported Nevada trust in which the alleged beneficiaries are John Wadsworth and about 15 allegedly defrauded Japanese investors. However, the Utah district court found in a separate case that there is no evidence the RBT Victim Recovery Trust has any legitimate beneficiaries, and that Wadsworth is not an appropriate trustee due to a "clear conflict of interest" and his ""insider status" in Talmage's business. Utah Findings at 78-79. The RBT Victim Recovery Trust is also a purported creditor in this bankruptcy proceeding.

allegedly defrauded investors have equitable interests in the RiverCliff Property. *Id.* NCPL and RiverCliff Farm, Inc., were parties to the quiet title suit, as was the United States. *Id.* In August 2017, the Oregon district court dismissed the quiet title suit for failure to state a claim. 2017 WL 3271722 (D. Or. Aug. 1, 2017). The court held that Talmage had an interest in the RiverCliff Property, and that the allegedly defrauded investors had, at most, an inchoate equitable claim to the property that could not take priority over the government's federal tax liens. *Id.*, at *9-11. The court reached this conclusion despite a $90 million (after trebling) judgment that the RBT Victim Recovery Trust obtained against Talmage by default in Utah state court, during the pendency of the Oregon Quiet Title Suit. *Id.*, at *3, *11. *See also* Oregon Quiet Title Suit, Judgment entered Sept. 29, 2017 (Dkt. No. 69). The Oregon Quiet Title Suit is currently on appeal to the Ninth Circuit. *See* No. 17-35805 (9th Cir.).

<u>Utah Foreclosure Suit.</u>

The United States filed suit in 2016 to obtain monetary judgments against Ronald and Annette Talmage for their million-dollar tax debts, and to foreclose federal tax liens on the Liberty Property. Utah Foreclosure Suit, Complaint filed Feb. 18, 2016 (Dkt. No. 2). Two entities that Wadsworth beneficially owns and controls, Western Land & Livestock, LLC and Western Reserve Mortgage, LLC (collectively, the "Western Entities"), were parties to the case. *Id.* The Liberty Property was titled to Western Land & Livestock, LLC, and Western Reserve Mortgage, LLC had a purported trust deed. *Id.* The United States obtained a judgment against the Talmages in August 2016 for over $20 million of unpaid taxes. *Id.*, Order Granting U.S. Motion for Default Judgment (Dkt. No. 38). Wadsworth, through the Western Entities, contested foreclosure of the Liberty Property and counterclaimed to quiet title, asserting that HCPL had "loaned" him the money for the purchase and the Talmages merely "rented" the property from him. *E.g.*, *id.*, Answer and Counterclaim (Dkt. No. 49); Western Entities' Motion for Summary Judgment and Reply Brief (Dkt. Nos. 64, 83).

After a 7-day trial in 2019, the Utah district court ruled that the Talmages owned the Liberty Property and had used money from HCPL to purchase and maintain it. Utah Findings at

5

64-76; Utah Foreclosure Suit, Dec. 2, 2019 Amended Judgment (Dkt. No. 339). The court held the Western Entities were the Talmages' nominees and fraudulent transferees, and found Wadsworth's testimony not credible, including his testimony on the purported purchase and lease arrangements with the Talmages/HCPL. Utah Findings at 43-56, 64-76. Moreover, the court found Wadsworth and the Western Entities failed to prove Talmage committed a Ponzi scheme, and discounted the Western Entities' expert because he relied on biased information from Wadsworth, an insider of HCPL and WWIS. *Id.* at 56-63, 76-80.

Prior to entry of final judgment, Wadsworth and the Western Entities consented to the appointment of a receiver to sell the Liberty Property. Utah Foreclosure Suit, U.S. Unopposed Motion to Appoint Receiver (Dkt. No. 295). After this bankruptcy case had been initiated (and still prior to final judgment), they consented to court authorization of the sale itself. *Id.*, U.S. Unopposed Motion to Authorize Sale (Dkt. No. 321) (filed Sept. 9, 2019). Sale proceeds of the Liberty Property are being held in the Utah district court registry. The Utah Foreclosure Suit is currently on appeal to the Tenth Circuit. *See* No. 20-4016 (10th Cir.).

Timing of U.S. and BVI Bankruptcy Proceedings.

Wadsworth began efforts to capture the Debtors in 2017,[4] and in 2019, initiated U.S. and BVI bankruptcy cases after losing at trial in the Utah Foreclosure Suit. During discovery in the Utah Foreclosure Suit, it surfaced that HCPL and NCPL had apparently loaned over $10 million to several of Wadsworth's entities for real estate deals unrelated to the Liberty Property. Utah Foreclosure Suit, U.S. Motion to Amend Complaint (Dkt. No. 163). When the United States sought to amend its complaint to collect on the promissory notes owed to HCPL and NCPL, Wadsworth revealed that he had taken over HCPL, NCPL, and WWIS in 2017 through his entity PR Capital, LLC and had installed an out-of-court BVI receiver. *Id.*, U.S. Reply re: Motion to Amend Complaint (Dkt. No. 170); Opposition to Motion to Amend Complaint (Dkt. No. 168).

---

[4] Wadsworth's efforts arguably began earlier, in 2016, with his efforts to seize the RiverCliff Property extrajudicially and take control of RiverCliff Farm, Inc. by reshuffling paperwork with the Oregon Secretary of State. Oregon Foreclosure Suit, U.S. Motion for TRO (Dkt. No. 6) at 3.

6

Despite having seized control of the Debtor entities in 2017, Wadsworth appears to have done nothing until mid-2019, after the Utah district court announced its preliminary ruling in favor of the United States after trial. Utah Foreclosure Suit, Minute Entry for June 28, 2019 (Dkt. No. 292). While the Utah district court was considering comments on its draft findings of fact and conclusions of law, the petitioning creditors—all of whom are represented in substance by Wadsworth—initiated involuntary Chapter 7 proceedings against the Debtors. *Compare* Petitions against Debtors *to* Creditors Matrix (listing contact information for all petitioning creditors as "c/o John Wadsworth"); Utah Foreclosure Suit, Dkt. Nos. 294, 296, 302-306, 318-320. The United States was not served with any of the filings in the three bankruptcy cases, including the two motions for recognition of foreign main proceeding and the four motions seeking to convert the case to Chapter 15. Dkt. Nos. 13, 30, 41, 42, 67, 71. Although the IRS is listed as a creditor on Schedule E of the bankruptcy schedules, Dkt. No. 61 at 12, neither it nor the United States is included in the Creditors Matrix.

Finally, formal BVI proceedings appear to have been instituted two months <u>after</u> the start of U.S. bankruptcy proceedings. Urgent Motion to Convert to Chapter 15 (Dkt. No. 71) at 2-3 (stating that BVI liquidation proceedings of Debtors commenced Oct. 22, 2019). Again, the United States did not receive notice of the BVI proceedings. As a result, the United States was unaware until mid-February 2020 that bankruptcy proceedings had been instituted against the Debtors in the United States or the BVI. The United States was only made aware when the RBT Victim Recovery Trust moved for a stay pending appeal in the Ninth Circuit, and referenced the ongoing bankruptcy. *Wadsworth v. Talmage*, No. 17-35805 (9th Cir.), Appellant's Motion for Stay filed Feb. 14, 2020 (Dkt. No. 50).

The United States had planned to file an opposition to the February 27, 2020 motion to convert to Chapter 15, which had a stated objection deadline of March 12, 2020. Dkt. No. 67. However, the foreign representative then filed an "urgent" motion to convert to Chapter 15 on March 3, 2020, Dkt. No. 71, which was granted *ex parte* on March 5, 2020, without giving any parties a chance to respond. Dkt. No. 75.

7

**DISCUSSION**

Depending on the timing, bankruptcy courts construe a motion for reconsideration as a motion to alter or amend judgment pursuant to Fed. R. Civ. P. 59(e), or Fed R. Civ. P. 60(b), made applicable in bankruptcy proceedings by Fed. R. Bankr. P. 9023 and 9024, respectively. *In re Aja*, 441 B.R. 173,177 (B.A.P. 1st Cir. 2011); *In re Mora Gonzalez*, 2018 WL 4961649, *2 (Bankr. D.P.R. Oct. 12, 2018); *In re Quesada*, 2013 WL 5945801, *1 (Bankr. D.P.R. Nov. 5, 2013). Reconsideration under Rule 59(e) or Rule 60(b) is appropriate where the movant shows a manifest error of law, newly discovered evidence, or where the district court has misunderstood a party or made an error of apprehension. *Ruiz Rivera v. Pfizer Pharmaceuticals, LLC*,521 F.3d 76, 81-82 (1st Cir. 2008).

Here, Rule 60(b) is applicable, rather than Rule 59(e), because the United States is not seeking to alter or amend a judgment. *Compare* Fed. R. Civ. P. 59(e) *to* Fed R. Civ. P. 60(b). Rule 60(b) provides for six separate grounds for relief, including mistake, surprise, or excusable neglect and fraud, misrepresentation, or misconduct by an opposing party. Fed. R. Civ. P. 60(b)(1) and (3).

The bankruptcy court in this district has distilled these factors for a motion for reconsideration to require: (1) genuine reasons why the court should revisit the prior order; and (2) compelling facts or law in support of reversing the prior decision. *In re Quesada*, 2013 WL 5945801, *1 (Bankr. D.P.R. 2013). As discussed below, the Court should set aside its previous orders recognizing the BVI proceedings as foreign main proceedings and converting these proceedings to Chapter 15 to give the United States a chance to present evidence showing that (1) the debtors manipulated the facts in an effort to engineer a center of main interests ("COMI") in the BVI, when in reality little to no business has actually been conducted there; and (2) the creditors initiated this bankruptcy proceeding in bad faith, apparently seeking a means to collaterally attack unfavorable judgments (which are currently on appeal).[5]

---

[5] The bankruptcy schedules also contain self-serving omissions of potential property of the estate, namely, at least $10 million in promissory notes held by the debtors. These notes appear to represent outstanding loans to

8

**I. Permitting the United States to object to Chapter 15 conversion is appropriate because it was never given proper notice of the bankruptcy proceedings or the motion.**

*a. Standard for "excusable neglect."*

Rule 60(b)(1) permits a court to provide relief from an order for "mistake, inadvertence, surprise, or excusable neglect." Fed. R. Civ. P. 60(b)(1); *In re Lozada Rivera*, 470 B.R. 109, 113 (Bankr. D.P.R. 2012). The determination of excusable neglect is an equitable one, considering factors such as: "(1) the length of the delay and its potential impact on judicial proceedings; (2) the reason for the delay, including whether it was within the reasonable control of the movant; (3) whether the movant acted in good faith; and (4) whether granting the relief will prejudice the opposing party." *Id.* (quoting *Pioneer Inv. Serv. Co. v. Brunswick Assoc. Ltd. Partnership*, 507 U.S. 380, 395 (1993)). Applying these factors here, equity demands that the Court allow the United States a chance to challenge the debtors' cursory evidence purporting to establish a foreign main proceeding in BVI.

    i. Length of the delay

First, the length of the delay is minimal as this Court granted recognition only on March 5, 2020, following the debtors' claimed "urgent" need for the conversion. This motion comes eight days after that order, which is only slightly longer than the five days approvingly cited in *In re Lozada* as minimal delay and *much* shorter than the two months cited in *In re Santos Rivera* as being too long. *Compare In re Lozada*, 470 B.R. at 114 *to In re Santos Rivera*, 2006 WL 3909923, \*4 (Bankr. D.P.R. Jan. 19, 2006). Thus, the United States has diligently filed this motion for relief seeking a chance to object to the foreign representatives' motion for conversion of this bankruptcy proceeding to Chapter 15.

    ii. Reason for the delay

Second, the reason for the United States' delay is simple: the foreign representatives contrived a false urgency to fast-track their motion for conversion to Chapter 15. The foreign

---

Wadsworth's entities that were used to invest in real estate. If these notes are indeed part of the estate, the Debtors could be solvent, and this would further indicate bad faith in these bankruptcy proceedings.

9

representatives manufactured an "urgent" need, relying on spurious assertions that the Oregon property belongs in the estate and may be sold at any time. This disingenuous claim is belied by the fact that: (1) NCPL was adjudicated to have no interest in the property; (2) it has been on the market for over two years and not been sold; and (3) any proceeds of the sale would be placed into the district court registry per the receivership order. (*Oregon Foreclosure Suit*, Dkt. No. 51). Accordingly, the foreign representatives' claim of urgency was without basis.

The fact that there was no urgency with respect to the Oregon property had to have been known by the foreign representatives. NCPL was a party to the Oregon case that was adjudicated and is currently on appeal. NCPL, of course, is one of the debtor entities that the foreign representatives purport to represent in this case, giving them constructive (if not actual) notice of their lack of interest in the property and the status of the property. Indeed, the property is the subject matter of their adversary complaint, so it is hard to imagine that they are not aware of the happenings with the Oregon case.

Next, the foreign representatives were appointed by a business entity run by Wadsworth, who is behind all of the litigation in the District of Utah and District of Oregon (and is essentially playing the role of both creditor and debtor in these bankruptcy proceedings). Accordingly, any assertion that the foreign representatives did not know about the status of the Oregon property, or the receivership order, should be met with skepticism.

This feigned urgency is compounded by the fact that the foreign representatives neglected to notify the United States of the bankruptcy proceedings, even though the property at issue and associated litigation has been known to them for at least two years. The United States only learned about the proceedings after counsel for the RBT Victim Recovery Trust, a purported creditor in these proceedings, sought a stay of the appeal it brought in the Ninth Circuit Court of Appeals in February 2020 (waiting about six months after it helped initiate these bankruptcy proceedings to do so). There is no reasonable way for the United States to have known about this proceeding and taken part in it without the foreign representatives providing notice of it.

Once the United States received actual notice of the bankruptcy proceedings through the motion to stay in the Ninth Circuit, the United States began to take the necessary actions to appear in the bankruptcy and oppose the foreign representatives' previously filed motion for conversion to a Chapter 15 bankruptcy. It was shortly after that, however that the foreign representatives asserted their "urgent" need for conversion, which prevented the United States from getting a chance to object to such conversion. Thus, any delay in these proceedings has been caused by the foreign representatives' failure to provide basic notice to the United States and efforts to game the system.

      iii.  Good faith

Third, the United States has acted in good faith. The United States has good reason to believe that the foreign representatives and the creditors, all of which are tied back to John Wadsworth, have initiated these bankruptcy proceedings for a fourth bite at the proverbial apple in a forum that Wadsworth perceives as more hospitable. As is obvious from the chain of events, these bankruptcy proceedings are an effort by Wadsworth to relieve himself of the burden of overturning valid judgments entered in the District of Oregon and the District of Utah. In an attempt to accomplish this, Wadsworth, through the veneer of impartial foreign representatives, has tried to manipulate the center of main interest ("COMI") for the debtor entities, HCPL, NCPL, and WWIS. As discussed further below, the debtors never conducted any business in BVI and neither the debtors' receiver, nor the foreign representatives, appear to have made any effort to find or liquidate any of the debtors' assets in the BVI (indeed, there are no assets there). Thus, the United States submits that recognition of the BVI insolvency proceedings as a foreign main proceeding under Chapter 15 is inappropriate as a matter of fact and law because their center of main interests ("COMI") is not in the BVI. *See, e.g.*, *In re Fairfield Sentry, Ltd.*, 714 F.3d 127 (2d Cir. 2013); *In re Creative Finance, Ltd.*, 543 B.R. 498 (S.D.N.Y. 2016).

      iv.  Prejudice to non-movant

Fourth, granting the United States' requested relief will not prejudice the foreign representatives. As an initial matter, it is not prejudicial to have to litigate a case or defend

11

against meritorious arguments. *See, e.g.*, *Perez v. Miami-Dade Cnty.*, 297 F.3d 1255, 1267-68 (11th Cir. 2002) (finding no prejudice in permitting a party to withdraw Rule 36 admissions because it was not prejudicial to require opposing party to prove merits of its case); *Monroe v. McDonald's Restaurants of Florida, Inc.*, 2011 WL 13238373, *1 (N.D. Fla. July 21, 2011) ("[h]aving to defend claims on the merits . . . is not the kind of prejudice that warrants denying leave to amend"); *Hall v. Richwine*, 2006 WL 4835918, *1 (S.D. Ind. June 29, 2006) (having to defend against claims on the merits is not prejudicial).

Further, the United States' requested relief will not substantially delay the proceedings. The United States still has time to answer or otherwise respond and the parties still need to establish a schedule for the rest of the case (assuming it continues forward). The United States can therefore simultaneously prepare a response to the adversary complaints while briefing its case to demonstrate how these bankruptcy proceedings were brought in bad faith and how Chapter 15 recognition is inappropriate as a matter of fact and law.

**II.     Permitting the United States to object to Chapter 15 conversion is appropriate because the foreign representatives have made material misrepresentations to the Court.**

Rule 60(b)(3) permits the Court to provide relief from an order on the basis of fraud, misrepresentation, or misconduct by an opposing party. Fed. R. Civ. P. 60(b)(3). To obtain relief under Rule 60(b)(3) a movant must show by clear and convincing evidence that the alleged misrepresentations or misconduct prevented it from fully and fairly presenting its case. *In re LaFata*, 344 B.R. 715, 724 (B.A.P. 1st Cir. 2006). If the movant establishes "that the misconduct was knowing or deliberate, there is a presumption that it prevented the movant from fully presenting its case." *Id.* (citing *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 923 (1st Cir. 1988)). If the movant does not establish the misconduct was knowing or deliberate, then it must prove "by a preponderance of the evidence the misconduct substantially interfered with the full and fair preparation or presentation of the case." *Id.* at 725.

12

Here, there is no legitimate dispute that the conduct of the foreign representatives prevented the United States from objecting to their motion for conversion of the bankruptcy proceedings to Chapter 15. As discussed above, the foreign representatives manufactured an "urgent" need that defies reason because the Oregon property has been for sale for two years (and, notably, throughout the entirety of these bankruptcy proceedings). When the creditors (*i.e.* John Wadsworth) initiated these bankruptcy proceedings in August 2020, neither the purported creditors, nor the foreign representatives, voiced any urgent concern about the sale of the Oregon property. It was only after nearly six months, and notification of the United States of the proceedings, that the sale of the Oregon property suddenly became "urgent" and the purported need to convert the case to Chapter 15 arose.

This timeline strongly suggests that the foreign representatives, creditors, and John Wadsworth manufactured the "urgency" in an effort to prevent the United States from opposing their motion to convert the case, rather than preserving the Oregon property. Indeed, given the fact that the RBT Victim Recovery Trust (a named creditor in these proceedings) and other Wadsworth entities are currently appealing their adverse judgments in both the Ninth and Tenth Circuits, these bankruptcy proceedings appear to be nothing more than an effort by Wadsworth to tilt the litigation terrain to something perceived as more favorable. This Court should not countenance such gamesmanship, blatant misconduct, and disregard for normal legal processes. The remedy to the above-discussed infractions is to provide the United States' requested relief, set aside the orders recognizing the BVI insolvency proceedings and converting these proceedings to Chapter 15 to permit the United States time to file its meritorious objection to such conversion.

> **III.    The United States' objection to Chapter 15 recognition and conversion has merit and should be sustained or, in the alternative, granted time for discovery.**

To properly obtain recognition of foreign insolvency proceedings via Chapter 15 of the bankruptcy code, one must show that the insolvency proceedings are taking place in either the debtors' COMI, or where they have an establishment. Recognition of a foreign insolvency

13

proceeding is not a "rubber stamp exercise," and the burden of proof to establish the appropriateness of such recognition is on the foreign representative(s). *In re Creative Finance, Ltd.*, 543 B.R. at 514. With respect to whether a foreign proceeding is recognized as main, 11 U.S.C. § 1516(c) does provide a presumption that a debtor's COMI is in the place of its registered office, however, such presumption is rebuttable and does not prevent a court from examining facts it believes are relevant. *Id.* at 1515. In fact, courts have recognized that Congress intended the presumption for "speed and convenience of proof where there is no serious controversy." *In re Basis Yield Alpha Fund (Master)*, 381 B.R. 37, 53 (S.D.N.Y. 2008) (quoting *In re SPhinX, Ltd.*, 371 B.R. 10, 18 (S.D.N.Y. 2007). There is no similar presumption in the context of a non-main proceeding. *Id.*

There are various factors involved in determining a debtor's COMI. Those factors include (but are not limited to) the location of the debtor's headquarters; the location of the debtor's managers; the location of the debtor's primary assets; the location of the majority of the debtor's creditors, or a majority of creditors affected by the case; and/or the jurisdiction whose law would apply to most disputes. *In re Fairfield Sentry, Ltd.*, 714 F.3d 127, 137 (2d Cir. 2013) (quoting *In re SPhinX, Ltd.*, 351 B.R. at 117)). These factors should not be applied mechanically and have been recognized to be helpful, but not required or dispositive to a COMI analysis. *In re Creative Finance, Ltd.*, 543 B.R. at 517. The overarching principle for a COMI analysis is to determine "where the debtor conducts its regular business, so that the place is ascertainable by third parties" and "is not easily subject to tactical removal." *Id.* at 517-18 (quoting *In re Fairfield Sentry, Ltd.*, 714 F.3d at 129).

The relevant time period to determine a debtor's COMI is the time at which Chapter 15 recognition is sought in the U.S. *In re Fairfield Sentry, Ltd.*, 714 F.3d at 133-34. Thus, in cases where a "foreign representative has engaged in significant pre-U.S. filing work to operate (or even liquidate) the foreign debtor in the jurisdiction where the foreign insolvency proceeding was commenced" the debtor's COMI may have changed locales. *In re Creative Finance, Ltd.*, 543 B.R. at 518. Yet, courts analyzing COMI have expressed concerns about COMI

14

manipulation and that a court "may look at the period between commencement of the foreign proceeding and the filing of the Chapter 15 petition to ensure a debtor has not manipulated its COMI in bad faith." *Id.* at 518 (quoting *In re Fairfield Sentry, Ltd.*, 714 F.3d at 137-38). In *In re Creative Finance*, the court denied recognition of the foreign proceedings because the foreign liquidator's "efforts were so minimal that the [c]ourt cannot find the necessary change in COMI." 543 B.R. at 520.

The case before this Court appears to be quite similar to *In re Creative Finance*. First, as exhaustively discussed in the district court's findings following the trial in Utah as well as the Tax Court opinion, HCPL, WWIS, and NCPL largely, if not exclusively, did business in Asia (specifically Hong Kong and Japan) and the United States. *Utah Foreclosure Suit*, Dkt. No. 324 at 7-9, 15-20, 56-63; *Talmage Tax Court Case*, at 2 n.3. The BVI was nothing more than a letter box jurisdiction. *Compare with In re Creative Finance*, 543 B.R. 498.

Second, Wadsworth, through PR Capital, purported to take control of the debtor entities and ostensibly turn control of the debtors over to a receivership in the summer of 2017. *Utah Foreclosure Suit*, Dkt. No. 168. The receivership, in turn, has worked with a BVI law firm (Forbes Hare) to represent the foreign representatives in the BVI proceedings. Based on the BVI insolvency filings, it appears that the debtors' creditors are funding the foreign representatives' efforts in these bankruptcy proceedings. *See* Dkt.. No. 71-4. In any event, what is apparent from the filings the foreign representatives submitted with their motion for Chapter 15 recognition is that neither they, nor the receiver, performed any liquidation tasks between being hired as receivers by PR Capital, and the filing of the involuntary bankruptcy with this Court. Thus, as was the case with the liquidators in *In re Creative Finance*, the foreign representatives do not appear to have performed any work, or sought to liquidate any of the debtors' assets, between July 2017 and October 2019. This means that the COMI has not shifted to BVI, but would have remained where the debtors conducted their "regular business, so that the place is ascertainable by third parties." *Id.* at 517-18 (quoting *In re Fairfield Sentry, Ltd.*, 714 F.3d at 129). That

location was primarily in Hong Kong, where the debtors had substantial business operations. *Utah Foreclosure Suit*, Dkt. No. 324 at 7-9, 15-20, 56-63.

Applying the other factors outlined in *In re SPhinX* further undermines the assertion that the debtors' COMI is in the BVI. The majority of the purported creditors are either based in the United States or Japan. The debtors' managers, until recently, were either located in Hong Kong, Japan, or the United States. And, while the debtors do not appear to have substantial assets, they do possess claims to payments on numerous promissory notes.[6] The parties to the promissory notes are either HCPL or NCPL on one side, and entities in which John Wadsworth ultimately holds the beneficial interest on the other. *Utah Foreclosure Suit*, Dkt. No. 324 at 56-63. Wadsworth's entities that borrowed money from HCPL and NCPL are based out of either Nevada or Wyoming and used the money, supposedly to purchase real estate in the United States. Based on the facts that the United States is aware, Wadsworth's entities have not been making the payments on these supposed loans.[7]

Thus, considering the above factors, the debtors' COMI has not shifted to the BVI. The foreign representatives have not conducted any significant business operations in the BVI or attempted to liquidate (or acquire) property they believed belonged to the debtors. Moreover, most of the debtors' purported creditors are where the debtors originally did business, either Japan or the United States. And, the debtors' managers did business up until approximately June 2016 out of Hong Kong. In short, the debtors' COMI is not BVI because that is not where a reasonable third party would expect to find them. Thus, recognition of the BVI insolvency proceedings is inappropriate. To the extent the Court is not prepared to deny conversion, at a minimum, the Court should permit discovery into what activities, if any, the foreign representatives have done in the two-plus years they have purportedly been in control of the debtor entities. Further, the Court should permit discovery into who is paying the foreign

---

[6] These promissory notes were also discussed in depth and entered into evidence during the trial in the District of Utah. *Utah Foreclosure Suit*, Dkt. No. 324 at 56-63.

[7] The debtors did not list these notes payable on the schedules submitted to the bankruptcy court.

representatives for their work. If, as the United States suspects, it is PR Capital (*i.e.* Wadsworth) he is essentially on both sides of the transaction in this case as both creditor and debtor.

## CONCLUSION

In sum, the United States has put forward compelling facts showing why the order converting these proceeding to Chapter 15 should be overturned. *In re Quesada*, 2013 WL 5945801, *1. The foreign representatives did not inform the United States about the pendency of the bankruptcy proceedings until nearly six months had passed. And, when the United States was preparing to appear in the bankruptcy proceedings and object to converting the case to a Chapter 15 proceeding, the foreign representatives contrived an "urgent" need to fast-track the proceedings, the result of which prevented the United States from mounting a substantive challenge to conversion. As explained above, the United States has substantial evidence that recognition of the BVI insolvency proceedings is inappropriate because their COMI is not located in the BVI and the foreign representatives, likely at the behest of John Wadsworth, have manipulated the COMI in an effort to collaterally attack the judgments in Oregon and Utah. Accordingly, the United States is entitled to have the order converting this proceeding to Chapter 15 set aside and should be given a chance to oppose such conversion on the merits.

Dated: March 13, 2020

    Respectfully submitted,

    RICHARD E. ZUCKERMAN
    Principal Deputy Assistant Attorney General

    /s/ Jennifer Y. Golden
    JENNIFER Y. GOLDEN
    Trial Attorney, Tax Division
    U.S. Department of Justice
    P.O. Box 683, Ben Franklin Station
    Washington, D.C. 20044
    Tel: 202-307-6547 (Golden)
    Fax: 202-307-0054
    Jennifer.Y.Golden@usdoj.gov

# CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2020, I served a copy of the foregoing document by filing a copy through the Court's CM/ECF system, which will send an electronic copy to:

Steven M. Berman
Shumaker, Loop & Kendrick, LLP
Bank of America Plaza
101 East Kennedy Boulevard, Ste 2800
Tampa, FL 33602
sberman@shumaker.com
*Attorney for Foreign Representatives and Petitioning Creditors*

Monsita Lecaroz Arribas
Office of the U.S. Trustee (UST)
Ochoa Building
500 Tanca Street, Suite 301
San Juan, PR 00901
ustpregion21.hr.ecf@usdoj.gov

Further, I hereby certify that on March 13, 2020, I caused a copy of the foregoing document to be served by first-class mail, postage prepaid, addressed to the following:

Heng Cheong Pacific Limited
c/o Commence Overseas Limited
Woodbourne Hall
P.O. Box 3162, Road Town
British Virgin Islands

New Century Properties Limited
c/o Commence Overseas Limited
Commence Chambers
P.O. Box 2208
British Virgin Islands

World-Wide Investment Services Limited
c/o Commence Overseas Limited
Commence Chambers
P.O. Box 2208
British Virgin Islands

Wesley Edwards
CVR Global Ltd.
P.O. Box 2424
Road Town, Tortola VG1110
British Virgin Islands

Richard Baird
Forbes Hare
Qwomar Building, 4th Floor
Blackburn Highway
Road Town, Tortola VG1110
British Virgin Islands

Respectfully submitted,

/s/ Jennifer Y. Golden
JENNIFER Y. GOLDEN
Trial Attorney, Tax Division
U.S. Department of Justice

18